ACCEPTED
13-14-00733-CR
THIRTEENTH COURT OF APPEALS
CORPUS CHRISTI, TEXAS
7/8/2015 9:44:07 AM
CECILE FOY GSANGER
CLERK

# IN THE THIRTEENTH COURT OF APPEALS
## CORPUS CHRISTI, TEXAS

FILED IN
13th COURT OF APPEALS
CORPUS CHRISTI/EDINBURG, TEXAS
7/8/2015 9:44:07 AM
CECILE FOY GSANGER
Clerk

## COURT OF APPEALS NO. : 13-14-00733-CR

## TRIAL COURT CASE NO. : 2013CRN001341 D2

**JUAN JOSE LOPEZ, JR.,**
                                **APPELLANT**

**V.**

**THE STATE OF TEXAS,**
                                **APPELLEE**

### STATE'S BRIEF

**ISIDRO R. ALANIZ**
**DISTRICT ATTORNEY**
**49TH JUDICIAL DISTRICT**

**By: David L. Reuthinger, Jr.**
**Assistant District Attorney**
**Webb County, Texas**
**1110 Victoria St., Ste. 401**
**Laredo, Texas 78040**
**(956) 523-4900**
**(956) 523-5070 (Fax)**
**dreuthinger@webbcountytx.gov**
**Bar No. 24053936**
ATTORNEY FOR THE STATE

# IDENTITY OF PARTIES AND COUNSEL

**APPELLANT:**

**JUAN JOSE LOPEZ, JR.**

Represented by:
J. EDUARDO PEÑA
1102 Scott Street
Laredo, Texas 78040
(956) 722-9854
(956) 722-9866 (fax)
jpena84@att.net

**STATE:**

**THE STATE OF TEXAS**

Represented by:
ISIDRO R. ALANIZ
District Attorney, 49th Judicial District
By: David L. Reuthinger, Jr., Assistant District Attorney
Webb County Justice Center, 4th Floor
1110 Victoria St., Suite 401
Laredo, Texas 78040
(956) 523-4951
(956) 523-5070 (Fax)
dreuthinger@webbcountytx.gov

# TABLE OF CONTENTS

IDENTITY OF PARTIES AND COUNSEL ...............................................2
TABLE OF AUTHORITIES .................................................................4
STATEMENT REGARDING ORAL ARGUMENT ................................7
GENERAL SUMMARY OF THE ARGUMENT ...................................8
GENERAL STATEMENT OF FACTS ................................................10
   A. The Victim ..........................................................................10
   B. The Scene ...........................................................................13
   C. The Suspects........................................................................16
   D. The Motive .........................................................................18
   E. The Appellant ......................................................................20
ISSUES PRESENTED .......................................................................24
  RESPONSE TO ISSUE 1 (Sufficiency of the Evidence): ......................24
   SUMMARY OF ARGUMENT .......................................................24
   ARGUMENT AND AUTHORITY....................................................25
    A. Standard of Review .............................................................25
    B. Application...........................................................................27
  RESPONSE TO ISSUE 2 (Cause of Death Instruction): .......................33
   SUMMARY OF ARGUMENT .......................................................33
   ARGUMENT AND AUTHORITY....................................................34
    A. The Requested Instruction Was Not Based on a Defensive Issue 34
    B. The Requested Instruction Was An Incorrect Statement of the Law ..........................................................................................37
  RESPONSE TO ISSUE 3 (Motion to Suppress): .................................38
   SUMMARY OF ARGUMENT .......................................................38
   STATEMENT OF FACTS ...........................................................38
   ARGUMENT AND AUTHORITY....................................................41
    A.  The Procedural Posture and Scope of the Record......................41
    B.  Standard of Review .............................................................43
    C. Applicable Law....................................................................44
    D. Application, Part 1: Appellant Failed to Establish Standing at the Suppression Hearing or Through His Offer of Proof......................46
    E. Application, Part 2: Appellant's Probable Cause Argument Ignores the Rochas' Waiver and the Emergency Exception............51
PRAYER.........................................................................................54
CERTIFICATE OF COMPLIANCE.....................................................55
CERTIFICATE OF SERVICE ............................................................55

# TABLE OF AUTHORITIES

**Cases**

*Abdnor v. State*, 871 S.W.2d 726, 731 (Tex. Crim. App. 1994) ...............36

*Barnes v. State,* 56 S.W.3d 221, 238 (Tex. App.—Fort Worth 2001, pet. ref'd)...................................................................................................27

*Black v. State*, 776 S.W.2d 700, 701 (Tex. App.—Dallas 1989) ...............48

*Brooks v. State*, 323 S.W.3d 893, 899 (Tex. Crim. App. 2010) ...........26, 31

*Calloway v. State,* 743 S.W.2d 645, 650 (Tex. Crim. App. 1988).......44, 48

*Carmouche v. State,* 10 S.W.3d 323, 327 (Tex. Crim. App. 2000)43, 44, 50

*Corbin v. State,* 85 S.W.3d 272, 275-76 (Tex. Crim. App. 2002)..............44

*Cox v. State*, 830 S.W.2d 609, 611 (Tex. Crim. App. 1992) ......................27

*Crowell v. Housing Authority of City of Dallas*, 495 S.W.2d 887 (Tex. 1973)...................................................................................................49

*Curry v. State*, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000).....................26

*De La Fuente v. State*, 432 S.W.3d 415, 422 (Tex. App.—San Antonio 2014, pet ref'd) ................................................................25, 26, 27, 28, 31

*Dowthitt v. State*, 931 S.W.2d 244, 249 (Tex. Crim. App.1996) ...............27

*Dunne v. State*, 263 S.W. 608, 616 (Tex. Crim. App. 1923).....................36

*Evans v. State*, 202 S.W.3d 158 (Tex. Crim. App. 2006)...........................29

*Fairfield Ins. Co. v. Stephens Martin Paving, LP*, 246 S.W.3d 653, 671 (Tex. 2008) ........................................................................................49

*Garza v. State,* 126 S.W.3d 79, 81–82 (Tex. Crim. App. 2004) ...............42

*Granados v. State,* 85 S.W.3d 217, 223 (Tex. Crim. App. 2002) ..............45

*Green v. State*, 566 S.W.2d 578, 584 (Tex. Crim. App. 1978) ..................37

*Guzman v. State,* 955 S.W.2d 85, 89 (Tex. Crim. App. 1997)...................43

*Hill v. State*, 585 S.W.3d 713 (Tex. Crim. App. 1979) ..............................36

*Hinojosa v. State*, 433 S.W.3d 742, 756 (Tex. App.—San Antonio 2014) .............................................................................................................31, 37

*Jackson v. Virginia*, 443 U.S. 307, 319 (1979) ........................................25

*James v. Fulcrod,* 5 Tex. 512, 520 (1851)................................................49

*Jester v. State*, 64 S.W.3d 553 (Tex. App.—Texarkana 2001) ..................35

*Kennedy v. State*, 385 S.W.3d 729, 729 n. 1 (Tex. App.—Amarillo 2012, pet. ref'd)...............................................................................................25

*Laney v. State*, 117 S.W.3d 854, 862 (Tex. Crim. App. 2003)...................52

*Luna v. State*, 268 S.W.3d 594, 602 (Tex. Crim. App. 2008) ....................46

*Mendoza v. State*, 88 S.W.3d 236, 238 (Tex. Crim. App. 2002)................36

*Mincey v. Arizona*, 437 U.S. 385, 392 (1978) ..........................................52

*Orellana v. State*, 381 S.W.3d 645, 651 (Tex. App.—San Antonio 2012) 30

*Penry v. State*, 903 S.W.2d 715, 748 n.30 (Tex. Crim. App. 1995)..........37

*Pesina v. State*, 949 S.W.2d 374, 382–83 (Tex. App.—San Antonio 1997, no pet.)....................................................................................30

*Ransom v. State,* 920 S.W.2d 288, 302 (Tex. Crim. App. 1996) (opinion on reh'g) ...................................................................................27

*Robinson v. State*, 368 S.W.3d 588 (Tex. App.—Austin 2012)................30

*Showery v. State*, 678 S.W.2d 103, 109 (Tex. App.—El Paso 1984)........37

*Solomon v. State*, 49 S.W.3d 356, 368 (Tex. Crim. App. 2001) ...............35

*State v. Henry*, 25 S.W.3d 260, 262 (Tex. App.—San Antonio 2000, no pet.)..........................................................................................42

*State v. Ross,* 32 S.W.3d 853, 855 (Tex. Crim. App. 2000).................43, 44

*State v. Simmang*, 945 S.W.2d 219, 233 (Tex. App.—San Antonio 1997)52

*State v. Wolfe*, 440 S.W.3d 643 (Tex. App.—Austin 2010).......................42

*Thompson v. State,* 697 S.W.2d 413, 417 (Tex. Crim. App. 1985)............27

*Villarreal v. State*, 893 S.W.2d 559, 561 (Tex. App.—Houston [1st Dist.] 1994), *aff'd,* 935 S.W.2d 134 (Tex. Crim. App. 1996) ...........................48

*Villarreal v. State,* 935 S.W.2d 134, 138 (Tex. Crim. App. 1996).......44, 45

*Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007) ........26, 29

**Statutes**

TEX. PENAL CODE ANN. § 7.01(a)...............................................................26

TEX. PENAL CODE ANN. § 7.02(a)(2) .........................................................26

TEX. PENAL CODE ANN. § 19.02(b)(1) ........................................................25

TEX. PENAL CODE ANN. § 20.04(2)(b) ........................................................25

TEX. PENAL CODE ANN. § 71.02 .................................................................25

TEX. CODE CRIM. PROC. ANN. art. 36.14 ....................................................36

TEX. CODE CRIM. PROC. ANN. art. 38.14.....................................................28

TEX. GOV'T CODE ANN. § 73.001................................................................25

**Rules**

TEX. R. APP. P. 41.3 ...................................................................................25

**Treatises**

Dix & Schmolesky, 43 TEX. PRAC., CRIMINAL PRACTICE AND PROCEDURE § 43:32 (3d ed.)....................................................................................35

**Other Authorities**

Appellant's Brief .......................................................................28, 41, 47, 51

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

Oral argument is not requested.

TO THE COURT OF APPEALS FOR THE THIRTEENTH DISTRICT OF TEXAS:

This brief is filed on behalf of Appellee, The State of Texas, by David L. Reuthinger, Jr., Assistant District Attorney.

## GENERAL SUMMARY OF THE ARGUMENT

Appellant's first issue, asserting insufficiency of the evidence, should be overruled because there was evidence to show that Appellant was guilty under the law of parties. Evidence was presented that Appellant's clothing, as well as one of the weapons used to torture the victim to death was a 2x4 board, upon which Appellant's DNA was found along with that of the victim and another codefendant. Appellant's clothing and shoes were splattered with the victim's blood as well. The defense conceded as much in closing. (19 RR 120).[1] This was sufficient evidence to elevate Appellant's role above mere presence. And this physical evidence was further corroborated by the testimony of the codefendants, who identified Appellant as directly aiding the commission of the murder.

Appellant's second issue, asserting that he was entitled to what he terms a "cause of death" jury instruction, should be overruled because this instruction did not relate to a defensive issue, but rather to an element of

---

[1] The reporter's and clerk's records are herein cited as ([Volume] [RR or CR] [Page]).

the offense which the State had to prove; there is no entitlement to such instructions, which generally constitute an impermissible comment on the state of the evidence. Moreover, the requested instruction was legally incorrect because it disregarded the law of parties. As such, the trial court acted properly in refusing to give the instruction.

Appellant's third issue, asserting that the trial court erred by denying his motion to suppress the evidence taken from the Napoleon Street house, should be overruled because Appellant failed to establish that he had standing to contest this search. Appellant gave inconsistent testimony about his living arrangements and his right to be in the house, which was later definitively controverted by real estate records. The trial court was well within its discretion in finding that a local drug dealer was not the landlord of the premises and had no authority to rent the house to Appellant for the consideration of Appellant vending drugs. Further, the initial entrance of the house by the police was not a warrantless search; it was an emergency aid action intended to save the life of the victim. Once it became clear that the victim was deceased, consent to search was obtained from the true owners, eliminating the need for a warrant.

Accordingly, the conviction should be affirmed.

# GENERAL STATEMENT OF FACTS

## A. The Victim

Ana Vasquez was riding in the family car on August 29, 2013. Her husband, Ricardo Vasquez, was driving her to the school where she worked as a teacher. (17 RR 27-28). It was the usual family routine; Mr. Vasquez would drive Ana to work and their son to his grandmother's house which was next to the school that their son attended. (17 RR 28). Then Ricardo would go to work. But today things would be a little different, Ricardo explained to Ana as he dropped her off. Today, Ricardo would be bringing his brother-in-law with him to work. (Id.). Ana was sure that this arrangement was fine and that she would be seeing her husband later. (Id.) But as she watched Ricardo drive off in the family's Nissan Rogue at 7:30 a.m., she was unaware that this would be the last time that she would ever see him alive. (Id.).

Although Ana was a busy teacher, she usually called Ricardo during lunch or during the teachers' planning block. (17 RR 29). That day, the school was hectic and there was a meeting during the planning block, so Ana did not get to call her husband until 4:00 p.m. (Id.) When she took her

phone out to do that, she saw that Ricardo's mother had made several calls and text messages to Ana's phone during the day. As Ana read through the modern-day telegrams, she knew that "something was wrong. He hadn't responded or answered her calls all day, and she wanted to go check on him and see if something was wrong." (Id.).

Ana began frantically calling her husband to no avail; having no vehicle, Ana called her mother to pick her up from the school. (Id.). She testified, "I kept calling him. I kept calling him. And he wouldn't answer the phone. The phone was turned off or something, because it would go straight to voice mail, and from there we knew something was happening. So we called the police." (Id.).

Ana's mother took her to Ana's home, and upon entering, Ana knew something was wrong. Ricardo's shirt and clothes that he had been wearing earlier that day were lying in the bedroom. (17 RR 30). And "there were other things in the kitchen that were moved or out that weren't there [that morning]." (Id.). Ana and her mother called the police to file a missing-person report at "about 5:30 or 5:15 [p.m.]" (17 RR 30-31).

At around 6:00 p.m., deputies from the Webb County Sheriff's Office arrived to conduct the missing-person investigation. Ana's heart sank further as they informed her that the family's Nissan Rogue was at a

wrecker lot. (17 RR 31). The deputies offered to take Ana to the lot so that she could verify the vehicle was hers, which she did. (17 RR 31-32).

---

The Vasquez family seemed normal, but as Ana explained to the jury, Ricardo had problems. Ricardo was a recovering drug addict who was a month out of rehab. (17 RR 34). As far as Ana could tell, Ricardo was on the mend and doing very well. (Id.).

But Ricardo had one foot still in the darkness. Ana explained that just before the fateful events on August 29, 2013, Ricardo "had just said that a man he knew approached him to help him out to bring back his son from Nuevo Laredo [in Mexico]. And I told him[,] just don't get involved. You don't have any means to help him. And I told him, just don't do it. Don't be involved with that. And he said, okay, okay, I won't." (17 RR 33-34).

Ricardo honored his wife's plea—and paid with his life.

## B. The Scene

Laredo Police officer Gustavo Sotelo was on routine patrol in a police cruiser driving through South Laredo, when a dispatch call from 911 came in at 7:00 p.m. (17 RR 38). It was a report of an assault in progress at a house known for drug transactions. (17 RR 37-38). He turned onto Bismark Street, then onto Napoleon Street to the site that had been called in to 911. (17 RR 39). At that time, he "observed one male subject like, heavy-set[,] light-completed[,] crew cut. As soon as he saw me, he made his way going north through the houses." (Id.; 17 RR 50). Officer Sotelo brought his cruiser around to that house and disembarked to follow the man on foot, but was unable to track him. (17 RR 40).

Officer Sotelo then turned to the house in question, located at 2920 Napoleon Street Rear. (17 RR 42).  It was owned by the Rocha family. (17 RR 53). The screen door of the house was unlocked, so Officer Sotelo knocked on the front door. It opened by itself. (17 RR 44, 46, 48). There, on a mattress in front of him, was the body of Ricardo Vasquez. "It was face up, gagged, and his hands were tied with an extension cord [and] bloody. … He was wearing shorts, I believe, blue jeans, shorts, and a red T-shirt … boxers tucked a little bit out. And he was wearing a multicolored shirt, heavy-set, light completed, crew cut" (17 RR 49). After sweeping the

rest of the house, Officer Sotelo called in Officer Ugarte and Detective Carmona to triage the crime scene. (17 RR 49).

They were joined by Investigator Andy Perez, who knew this house well; it was "known to [be used to] sell drugs in that neighborhood. And [he had] personally stopped vehicles leaving there[,] … intervened in drug transactions and also search warrants [there] …." (17 RR 56, 58). On this occasion, the officers had obtained the consent of the owners of the Napoleon Street house—Ricardo Rocha and his wife, Zenaida Sanchez Rocha—to begin searching the house for evidence after it had been cleared. (18 RR 17-19).

The entrance to the residence was darkened by bloody footprints that led into a room with a table, a bloody wooden 2x4 board, and a blood-soaked mattress on which Ricardo's body lay. (17 RR 93, 98-99). Elsewhere in the house was painter's tape, also bloody. (Id.; 17 RR 108) The officers carefully documented the rufous shoe impressions throughout the house. (17 RR 100, 104). Outside the house was a blood-soaked rag. (17 RR 104-05).

A full autopsy of Ricardo Vasquez's body identified lacerations and bruises, copious evidence of blunt-force trauma. (17 RR 139-44). There were also stab wounds. (17 RR 146). His hands had been bound with an

electrical cord—so tightly that the cord had to be cut. (17 RR 200). The only conclusion was that Ricardo was tortured to death. (17 RR 155). His death was caused by multiple sharp force and blunt force injuries. (17 RR 146). However, shortly before his death, he had taken heroin—as indicated by the short-lived opiate metabolites which were detected in his blood. (17 RR 149). The house was scattered with needles of the type used by heroin addicts. (18 RR 86).

The reason why the mattress was so bloody was that Ricardo Vasquez was still alive when his face was sheared by a sharp object. Each pump of his heart then splattered blood on that bed. (17 RR 151). And one of the lacerations cut the jugular vein of his neck—causing the curtain on Ricardo's life to fall within fifteen minutes. (17 RR 157, 152). Officer Gerardo Gonzalez swabbed the bloody mattress, the 2x4 board, and the blood-stained floor for additional DNA testing. (17 RR 124-26). Fingerprints were also lifted from virtually every moveable object at the scene—soda cans, bottles, cups, anything. (18 RR 43-45, 83). The mattress itself was taken to the city warehouse for storage and subsequent testing, including DNA testing. (Id.; 18 RR 57). The bloody shoe impressions were likewise sampled and sent to the Bexar County crime lab. (18 RR 84).

Detective David Carmona turned his attention to that 2x4 board; it was leaning in a corner next to Ricardo Vasquez's body. (18 RR 64). The officers suspected that this board was a weapon, an instrument of torture; though some of Ricardo's wounds were consistent with the use of sharp objects, the board was the only weapon found at the scene. (18 RR 65). The board was also tested for DNA; but recovered DNA would not be of much use without having some suspects to compare it to.

### C. The Suspects

While Officer Sotelo and company were searching the grisly torture chamber, Investigator Samuel Reyes was also on scene, interviewing witnesses, including a member of the Rocha family—who fingered Raul Alegría as being involved. (17 RR 71). Alegría was the man who had scrambled away from the house when Officer Sotelo arrived. (7 RR 53). Investigator Reyes confronted Alegría, whose nervousness gave him away; Alegría was thereafter transported to the police station to be interviewed. (17 RR 75). Alegría's shirt, jeans, and white Lacrosse shoes were sent to the DNA lab. (17 RR 181-83); (18 RR 24). The officers also swabbed his mouth for DNA with his consent. (17 RR 38-39).

Officer Sotelo found no other potential witnesses besides the man who ran north when he parked his cruiser; even the local ice-cream vendor saw nothing. (17 RR 41). The officer did remember seeing a black Dodge Avenger with a female driver and male passenger leaving the area as he arrived, and he suspected that it had driven out from the house while Ricardo's body lay in repose. (17 RR 52).

In conjunction with the other officers, Officer Carlos Hernandez also canvassed the neighborhood looking for witnesses. (17 RR 77). It was now after midnight, 12:30 to be exact; at that time, a woman from the neighborhood, Olga Martinez, approached him; she was concerned by the police activity. (17 RR 79). Moreover, she was looking for a family member that frequented the house where Ricardo Vasquez had died. She claimed that a "family member was a known drug user that would frequently go out there to shoot up. And because the crime scene was in that vicinity, she was just worried [about] making sure that he was not involved." (17 RR 79-80). That family member was her brother: Candelario "Cande" Hernandez, a known heroin user who frequently shot himself up at that house. (17 RR 80). She stated that Cande had just been at the house at 12:30, just a moment before she approached Officer Hernandez. (Id.).

Testifying, Ms. Martinez explained that her brother had asked her for a ride to a house on Napoleon Street earlier that day. (17 RR 117). She dropped him off at 2920 Napoleon. (Id.). And she had just returned to where she had left him because of the news that someone had been hurt there. (Id.). According to Ms. Martinez's mother, Cande had left the mother's house earlier in the evening, 30 minutes before news of the homicide broke. (17 RR 118-19, 121). She confirmed that, sadly, Cande was another drug user. (17 RR 120).

### D. The Motive

So far, the list of suspects included Cande and Alegría. The police searched their intelligence to finger other persons with a connection to this dungeon of a house who could have been there at the time. A series of missing-persons reports were filed concerning people with such connection. One of them was Abelardo Rocha, III—of the same Rocha family who owned the death chamber at 2920 Napoleon. (17 RR 206). Checking customs records and security video at the Mexican border, the police were able to confirm that Abelardo Rocha, III crossed into Mexico on August 7, 2013 at approximately 8:37 p.m., along with some other men. (17 RR 209). That was a little more than two weeks before Ricardo Vasquez was murdered.

Detective Richard Reyes interrogated Alegría about the role of Abelardo Rocha, III, and Alegría confirmed that "the motive for the murder [of Ricardo Vasquez] was extortion. He explained that a group of people were being extorted for money and a vehicle in exchange for locating a family member who was kidnapped." (17 RR 214). Abelardo Rocha, III was that family member. (Id.).

So the pieces came together: Abelardo Rocha, III had been kidnapped and forcibly taken into Mexico by drug cartel goons who were owed money. (Id.; 17 RR 210). Said goons demanded money and a vehicle from the Rocha family as ransom. (17 RR 214). Recall the testimony of Ricardo Vasquez's wife Ana—just before he was murdered, Ricardo "had just said that a man he knew approached him to help him out to bring back his son from Nuevo Laredo [in Mexico]." (17 RR 33-34). Ana demanded that Ricardo refuse to comply with that request; she begged her husband to stay out of the underworld he had fought so hard to leave.

The man who had made the request was Abelardo Rocha, Sr., also known as "Pantera"[2]—the uncle of the abductee, and the father of Abelardo Rocha, Jr. "Pantera" believed that Ricardo Vasquez owed money to him from the time in his life that he was a drug user. (17 RR 217). At

---

[2] Or "the panther."

Ana's insistence, Ricardo Vasquez had rejected the loan modification agreement—rescue the nephew—so "Pantera" decided to foreclose. According to the detective, the trustee's sale was conducted as follows: Pantera "directed a group of men to torture and kill the victim, Ricky Vasquez. … Alegría explained that Rocha, Sr., brandished a buck knife and slashed the victim's throat and cut off a portion of his ear. … During the torturing, Mr. Alegría stated that Rocha, Sr., said, this is probably what they're doing to my nephew in Mexico right now." (17 RR 214-17).

Cande Hernandez was also interviewed, and he gave gruesome details about how the execution was carried out, and how the victim had tried to be escape—and that Cande struck the victim with the 2x4 board, which the victim took and tried to defend himself with—in futility. (18 RR 117). Thereafter, Pantera promptly jumped bail and fled into Mexico. (17 RR 218). But the police were determined to find every one of his henchmen that they could.

### E. The Appellant

The police investigation in this case was so thorough that every bloodstained footprint in the Napoleon house had to be accounted for and checked against the known associates of Pantera. A forensic scientist

confirmed that a red Nike shoe which belonged to the Appellant, Juan Jose Lopez, Jr., was responsible for one of the bloody footprints in the Napoleon house. (18 RR 32; 19 RR 51-52).

The police procured those Nike shoes worn by the Appellant on the day of the murder. (18 RR 91). They had blood on them, blood that matched the DNA of the victim, Ricardo Vasquez. (18 RR 159-60); (State's Ex. 179). The same was true for the rest of Appellant's clothing: his shirt and shorts (18 RR 180-82). Appellant's shorts also had his own DNA on them. (18 RR 183). DNA testing on the 2x4 board found that it matched three people: Cande, who admitted to striking the victim with it; the victim, who was so struck; and the Appellant. (18 RR 169, 172-173, 211).

During his interview, the Appellant admitted that he, in the words of the officer, "was at the home of [Abelardo or] Abel Rocha, Sr., [also known as] Pantera" around the time of the murder. (18 RR 105). The Appellant claimed that his business with "Pantera" was limited to yard work. (Id.).

Yet the Appellant had the victim's blood all over him, and the Appellant's DNA was on one of the murder weapons. Accordingly, the Appellant was indicted for the murder and aggravated kidnapping of Mr.

Vasquez, and for engaging in the organized criminal activity of murdering Mr. Vasquez alongside Alegría, Candelario Hernandez, Abel Rocha, Sr. ("Pantera"), Abel Rocha, Jr., and Sergio Garcia–all of whom were also indicted for the same three crimes.

Naturally, the Appellant sought to suppress the physical evidence— the only admitted non-accomplice evidence that tied him to the scene. During the motion to suppress hearing, Appellant identified Abel Rocha, Sr., a/k/a Pantera, as the one who permitted Appellant to stay there. (13 RR 25). There was no evidence to establish that Pantera was an owner or lessor of the house, or that he had any authority to lease the house to Appellant on behalf of the actual owners. Appellant did not know where Pantera lived, or how he could have given Appellant permission to stay at the Napoleon house. (13 RR 25). Appellant further admitted that the 'consideration' for this arrangement was that Appellant would sell drugs out of the Napoleon house. (13 RR 26). Appellant claimed that Pantera was the owner of the house. (13 RR 26). Nevertheless, he admitted that the actual owners, Ricardo Rocha and Zenaida Sanchez Rocha, never told him he could stay there. (13 RR 27). Appellant otherwise had no lease or title interest in the house, and he admitted that he also stayed at another house. (13 RR 25). And after the suppression hearing, the State admitted

Webb County Appraisal District records proving that Ricardo and Zenaida Rocha, not Pantera, were the owners—and Appellant was just a trespasser without a place to stay. (18 RR 40).

However, after the trial, the jury gave the Appellant a place to stay: prison. Appellant was convicted of the three counts and given 50 years to serve for the murder, 17 for the aggravated kidnapping, and 10 for the criminal combination. (1 CR 500). Rent for said living arrangements was assessed as a $30,000 fine. (Id.). Appellant now claims that the evidence was legally insufficient to tie him to these offenses, that the jury charge was erroneous, and that all of the evidence from the Napoleon Street house should have been suppressed. The State responds as follows.

## ISSUES PRESENTED

**RESPONSE TO ISSUE 1 (Sufficiency of the Evidence):**

**Whether the evidence is legally sufficient to sustain the convictions for murder, aggravated kidnapping, and engaging in organized criminal activity?**

## SUMMARY OF ARGUMENT

Appellant's challenge to the sufficiency of the evidence hinges on his claim that there was no evidence that Appellant Juan Jose Lopez, Jr. committed the crime as a party. However, all that was required to establish Appellant's guilt was evidence establishing his presence plus proof of suspicious activity from which a rational juror could infer a common plan to kidnap and murder Ricardo Vasquez. That the victim's blood was all over Appellant's clothing certainly is evidence of suspicious activity. As such, a rational juror could have found that the Appellant committed the offenses against Ricardo Vasquez as a party thereto.

## ARGUMENT AND AUTHORITY

Appellant was charged in three counts with committing the murder of Ricardo Vasquez by intentionally or knowingly causing his death, TEX. PENAL CODE ANN. § 19.02(b)(1); with the aggravated kidnapping of the same victim by intentionally or knowingly abducting him by interfering with his liberty through the use of deadly force, *Id.* § 20.04(2)(b); and with engaging in organized criminal activity by committing the said murder in a combination with the codefendants, *Id.* § 71.02.

### A. Standard of Review

In reviewing legal sufficiency, the Court should consider all the evidence, both direct and circumstantial, in the light most favorable to the verdict to determine whether any rational trier of fact could have found all the essential elements of the offense beyond a reasonable doubt. *De La Fuente v. State*, 432 S.W.3d 415, 422 (Tex. App.—San Antonio 2014, pet ref'd) [3] (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *Brooks v.*

---

[3] This case was transferred from the Fourth Court of Appeals to the Thirteenth Court of Appeals pursuant to a docket equalization order issued by the Supreme Court of Texas. TEX. GOV'T CODE ANN. § 73.001. As such, this Court should respectfully apply the precedent of the transferring court. TEX. R. APP. P. 41.3; *Kennedy v. State*, 385 S.W.3d 729, 729 n. 1 (Tex. App.—Amarillo 2012, pet. ref'd).

*State*, 323 S.W.3d 893, 899 (Tex. Crim. App. 2010). It is the jury's role to resolve conflicts in the testimony, assess credibility and weigh the evidence, and draw reasonable inferences from the basic facts to the ultimate facts. *Brooks*, 323 S.W.3d at 899. In conducting a legal sufficiency review, the Court should defer to the jury's assessment of the credibility of the witnesses and the weight to be given to their testimony, rather than substitute its own judgment for that of the jury. *Id*.; *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). Further, the Court should resolve any inconsistencies in the evidence in favor of the jury's verdict. *Curry v. State*, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000).

A person may be convicted as a party to an offense if the offense is committed by the conduct of another for which he is criminally responsible. TEX. PENAL CODE ANN. § 7.01(a). A person is criminally responsible for the conduct of another if "acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense...." *Id.* § 7.02(a)(2); *De La Fuente*, 432 S.W.3d at 422. Mere presence of a person at the scene of a crime either before, during or after the offense, or even flight from the scene, without more, is insufficient to sustain a conviction as a party to the offense; however, combined with other incriminating evidence

it may be sufficient to sustain a conviction. *De La Fuente*, 432 S.W.3d at 423 (citing *Thompson v. State,* 697 S.W.2d 413, 417 (Tex. Crim. App. 1985)). In determining whether a defendant participated as a party in the commission of an offense, the jury may consider events that occurred before, during or after the offense, and may rely on acts that show an understanding and common design. *De La Fuente*, 432 S.W.3d at 423 (citing *Ransom v. State,* 920 S.W.2d 288, 302 (Tex. Crim. App. 1996) (opinion on reh'g); *Barnes v. State,* 56 S.W.3d 221, 238 (Tex. App.—Fort Worth 2001, pet. ref'd) (agreement to act together in a common design is usually proven by circumstantial evidence)).

Therefore, the test for legal sufficiency to sustain a conviction as a party can be simply stated as some evidence from which a rational juror could deduce Appellant's "presence combined with other suspicious circumstances … sufficient to tend to connect the defendant to the crime." *De La Fuente*, 432 S.W.3d at 421 (citing *Dowthitt v. State*, 931 S.W.2d 244, 249 (Tex. Crim. App.1996); *Cox v. State*, 830 S.W.2d 609, 611 (Tex. Crim. App. 1992)).

## B. Application

Appellant concedes that he was implicated in the offense by codefendants Sergio Garcia and Raul Alegría, and that their accomplice

statements were corroborated by the Appellant's DNA being present on the 2x4 board along with that of the victim and codefendant Cande Hernandez, by the victim's DNA being present on Appellant's clothing and shoe, and by the bloody shoe impression at the crime scene matching Appellant's shoe. (Ant. Brief at pp. 15-16) (citing 17 RR 213-14; 18 RR 32, 180-83, 190-95; 19 RR 51-52).[4] But Appellant argues that this evidence establishes only his *presence* at the scene, and not necessarily his *participation* in the murder and kidnapping. He argues that since DNA can be transferred by touch, it is possible that he just touched the victim at some point before the incident—never mind that that the DNA in question came from blood stains. The *victim's blood* stains. (18 RR 180-82).

So while Appellant concedes the presence of the *victim's blood* on his clothing and shoe, he downplays the sanctity of that blood. (Ant. Brief at pp. 15). Appellant's argument is, essentially, that the blood-drawn inference of his active participation in the murder and kidnapping is no stronger than a competing inference that he just stood there as a bystander

---

[4] Appellant has not mentioned the accomplice-witness rule, but the State will. It provides that Garcia and Alegría are accomplices as a matter of law; accordingly, their testimony is insufficient to sustain the conviction absent corroboration. TEX. CODE CRIM. PROC. ANN. art. 38.14; *De la Fuente*, 432 S.W.3d at 421. The required corroboration can be provided by the same evidence of suspicious circumstances that proves up the participation of a party in the office. *See id*. Here, the corroborating evidence is the victim's blood splattered on the Appellant's clothing and the DNA evidence on the 2x4 board connecting Appellant to that weapon. (18 RR 170-174).

while everybody else kidnapped and tortured Mr. Vasquez, whose blood then squirted him by chance.[5] But the weighing of competing inferences is for the jury, and is not part of legal sufficiency review. *Jackson*, 443 U.S. at 326 ("When the court is faced with a record of historical facts that supports conflicting inferences, it must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution"). They found him guilty, a finding entitled to deference on appeal. *Brooks*, 323 S.W.3d at 899. In so doing, the jury drew a reasonable inference from the presence of the victim's blood on Appellant's clothing that he acted in a common design with the other codefendants to kidnap and kill Ricardo Vasquez. *See id.; cf. De la Fuente*, 432 S.W.3d at 422-23 (defendant's unusual behavior in driving to murder scene, driving away from dying victim, and driving to ranch hideout was evidence of such common design).

Therefore, the only way Appellant could succeed is if absolutely *no* rational juror could draw an inference from the presence of the victim's blood on his clothing to the conclusion that he participated in the murder. On the contrary, the presence of the victim's blood is precisely the type of

---

[5] In support of this red herring, Appellant cites inapposite opinions which did not address party liability at all. (Ant. Brief at pp. 19-20) (citing *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007); *Evans v. State*, 202 S.W.3d 158 (Tex. Crim. App. 2006)).

suspicious circumstance that establishes his participation; in fact, it is enough to establish that he is guilty as the *principal actor*. *Orellana v. State*, 381 S.W.3d 645, 651 (Tex. App.—San Antonio 2012) (blood stain in appellant's vehicle matched victim, establishing principal responsibility); *Robinson v. State*, 368 S.W.3d 588 (Tex. App.—Austin 2012) (same result when victim's blood in appellant's vehicle was combined with appellant's possession of murder weapon and bloody clothes, distinguishing an inapposite case).[6]

Finally, Appellant points out the confession of Candelario "Cande" Hernandez that he struck the victim with the 2x4 board. (18 RR 117). Appellant argues that Cande's admission that he was a primary actor absolutely excludes the Appellant from *both* principal and party responsibility for the offense. This is a non sequitur, as illustrated by the testimony that not all of the victim's wounds were caused by that 2x4

---

[6] Appellant's argument might hold water if the evidence established that his participation came *after* the commission of the offense, such as if he had disposed of evidence afterwards, *and* there was no evidence of any previous agreement for the Appellant to participate in the offense before or while it was committed. *Pesina v. State*, 949 S.W.2d 374, 382–83 (Tex. App.—San Antonio 1997, no pet.) (acquitting where there was no evidence of an agreement, and the jury charge restricted theory of party liability to post-crime participation). But this is not such a case; the Appellant's DNA was mixed with the victim's DNA *on a murder weapon*, the 2x4 board, which was there at the scene next to the body of the deceased. (18 RR 170-74).

board,[7] and the fact that Appellant's DNA was found on the 2x4 board *along with* that of the victim and codefendant Hernandez. Hernandez's confession cannot dispel the inference that Appellant was either a primary actor or a party to the offenses. *Hinojosa v. State*, 433 S.W.3d 742, 756 (Tex. App.—San Antonio 2014) (holding jury was free to choose between accomplices' conflicting accounts of aggravated kidnapping to impose party and principal liability among the three actors). Since the jury had the power to choose to believe or disbelieve the testimony of any witness, it was free to accept or disregard Candelario Hernandez's confession in whole or in part, and to decide how to square it with the DNA evidence to assign party or principal liability to both Hernandez and Appellant. *See id.*; *De la Fuente*, 432 S.W.3d at 423 (citing *Brooks*, 323 S.W.3d at 899). Quite simply, the Appellant has not shown any authority for his argument that Hernandez's confession absolves him of party liability. There is none.

---

[7] Appellant seems to be positing that the conviction hinged on the board being the one and only murder weapon; this is not so. The victim sustained both blunt-force and sharp-force wounds. (17 RR 143-44). According to an expert witness, only the former could have been caused by the 2x4 board. (17 RR 140-44). The Appellant agrees. (Ant. Brief at p. 9). And the indictment did not specifically plead that the either the board or a sharp object was the sole cause of Mr. Vasquez's death. (1 CR 77). It alleged that he died because one or more of the codefendants struck "him with a blunt object causing blunt trauma to his body, and/or head, and/or face, and/or [caused] a laceration to his neck[.]" (Id.) Similarly, the aggravated kidnapping count alleged the deadly weapon exhibited was "a blunt object and/or a sharp object…." (Id.).

As such, the State respectfully requests that Appellant's first point of error, concerning legal sufficiency, be overruled.

**RESPONSE TO ISSUE 2 (Cause of Death Instruction):**

**Whether the trial court committed reversible error by refusing the defendant's requested jury instructions which would have included an affirmative submission of the defensive theory of the cause of death of the alleged victim in the jury charge?**

## SUMMARY OF ARGUMENT

Cause of death and identity are not defensive issues, but rather, are elements of the State's case. As such, the Appellant was not entitled to the requested instruction, and the trial court did not err by declining to give the instruction. Moreover, Appellant's requested instruction was legally incorrect because it disregarded the law of parties. The trial court correctly declined to charge the jury on it.

## ARGUMENT AND AUTHORITY

Appellant urges that he was entitled to a jury instruction on the issue of who caused the victim's death. His theory, as stated in the charge he requested, is that "if you [the jury] find from the evidence, that Abel Rocha caused the death of Ricardo Vasquez by causing a deep laceration to his neck with a sharp instrument, you shall acquit Juan Jose Lopez, Jr., of the charge of murder as alleged in Count I of the indictment." (Ant. Brief at p. 27) (quoting 1 Supp. CR 96-97). Appellant was not entitled to the instruction for at least two reasons.

### A. The Requested Instruction Was Not Based on a Defensive Issue

Though Appellant describes this as a "cause of death" instruction, the gist of it is an instruction on identity of the primary actor. Either way, neither the identity of the primary actor nor the cause of death are defensive issues; rather, they are essential elements of the State's case. To convict Appellant of murder, the State had to prove the facts alleged in count I of the indictment: "**JUAN JOSE LOPEZ, JR.** [and the codefendants] … did then and there … cause the death of … Ricardo Vasquez … **by striking him with a blunt object causing blunt trauma to his body, and/or head, and/or face, and/or causing a laceration to**

**his neck**[.]" (1 CR 77) (emphasis added). The requested instruction touched on both bolded elements of the offense.

Since "the 1974 Penal Code was enacted, the Court of Criminal Appeals … appears to have taken the position that a defense or affirmative defense must be defined in the Penal Code to warrant a separate instruction presenting it to the jury." Dix & Schmolesky, 43 TEX. PRAC., CRIMINAL PRACTICE AND PROCEDURE § 43:32 (3d ed.). For example, alibi "was not an enumerated defense in the penal code and the issue was adequately accounted for within the general charge to the jury. Because alibi was **merely a negation of elements in the State's case**, its inclusion would be superfluous, and in fact, would be an impermissible comment on the weight of the evidence." *Id.* (quoting *Solomon v. State*, 49 S.W.3d 356, 368 (Tex. Crim. App. 2001)) (emphasis added).

Appellant's requested instruction simply affirmatively negates two of the elements of the offense, identity and manner/means; it is therefore not a defensive-issue instruction of the type he would have been entitled to. *See Jester v. State*, 64 S.W.3d 553 (Tex. App.—Texarkana 2001). The instruction is really a comment on the weight of the evidence, assigning magical acquitting properties to one particular reconciliation of the

evidence; such instructions are prohibited by statute. *Abdnor v. State*, 871 S.W.2d 726, 731 (Tex. Crim. App. 1994); *see* TEX. CODE CRIM. PROC. ANN. art. 36.14 ("the judge shall … deliver to the jury … a written charge … not expressing any opinion as to the weight of the evidence, not summing up the testimony, [nor] discussing the facts…."). There "is no better established rule than [this]: '[it] is not proper for the court to single out particular facts or specific parts of the testimony and charge thereon. To do so would be instructing on the weight of the evidence.'" *Dunne v. State*, 263 S.W. 608, 616 (Tex. Crim. App. 1923); *see Mendoza v. State*, 88 S.W.3d 236, 238 (Tex. Crim. App. 2002).

Moreover, the instruction is *not* an alternative theory as to *how* Ricardo Vasquez died versus the indictment, and no other explanation for the victim's death other than those in the indictment was suggested by the evidence. So even assuming arguendo that Appellant's key case, *Hill v. State*, 585 S.W.3d 713 (Tex. Crim. App. 1979), is still good law, its superseded pre-Code rule would nevertheless be "inapplicable to the instant case. The refusal of a defendant's requested instruction is not error where the requested instruction is merely an affirmative submission of a defensive issue which denies the existence of an essential element of the State's case." *Penry v. State*, 903 S.W.2d 715, 748 n.30 (Tex. Crim. App.

1995) (citing *Green v. State*, 566 S.W.2d 578, 584 (Tex. Crim. App. 1978)).

**B. The Requested Instruction Was An Incorrect Statement of the Law**

Further, the instruction was incorrect because it ignores the law of parties. *Even if* Abel Rocha "caused the death of Ricardo Vasquez by causing a deep laceration to his neck with a sharp instrument," it does not necessarily follow that the jury had to then "acquit [Appellant] Juan Jose Lopez, Jr., of the charge of murder[.]" Rather, Appellant could have been, and was, convicted as a party to the murder, kidnapping, and combination. *Hinojosa*, 433 S.W.3d at 756. There is no entitlement to an incorrect instruction. *Showery v. State*, 678 S.W.2d 103, 109 (Tex. App.—El Paso 1984).

As such, the State respectfully requests that the second part of Appellant's second point of error be overruled.

**RESPONSE TO ISSUE 3 (Motion to Suppress):**

**Whether the trial court erred in finding that the appellant did not have standing to complain of the warrantless search of the home where the police found the body of the alleged victim and in thus denying the appellant's motion to suppress evidence and allowing the State to introduce illegally obtained evidence?**

## SUMMARY OF ARGUMENT

Appellant failed to establish that he was given permission to stay at the residence by its owners, or that the person who allegedly permitted him to stay at the house any authority whatsoever to do so. As such, Appellant did not have standing to challenge the search and the trial court correctly so held. Moreover, the initial police entry was done under the emergency-aid doctrine, no warrant was required for this, and consent was obtained from the owners after the emergency was over.

## STATEMENT OF FACTS

Appellant filed a motion to suppress the evidence taken from the Napoleon Street house on January 23, 2014. Appellant then filed a motion

to continue the setting on the suppression motion on August 21, 2014, to which the State agreed. (1 CR 52, 246-50).

A cursory hearing on the motion, limited to the issue of standing *only*, was held on September 11, 2014, and recorded in volume 13. The trial court expressly limited this hearing to the question of standing. (13 RR 21-22). Only the Appellant was permitted to testify, after which testimony the trial court found that Appellant did not have standing to challenge the search. An order denying the motion to suppress was entered accordingly. (1 CR 330).

On October 16, 2014, Appellant filed an offer of proof in open court, acknowledging that the trial court had limited the scope of the September 11 hearing to standing only, but re-urging the motion on the issue of probable cause, and attaching Officer David I. Carmona's complaint affidavit as proof. (1 CR 334-503). This colloquy followed:

> MR. PENA (Appellant's counsel): … The Court found no standing, and we just stopped right there. And so, for purposes of appeal, Your Honor, I need to have something to show whether or not there was probable cause and exigent circumstances to justify a warrantless search of the premises.
>
> THE COURT: Well, my gut instinct tells me we needed to have an evidentiary hearing on that portion as well.

MR. SOSA [Counsel for codefendant Sanchez]: We join in that, Your Honor.

THE COURT: If I remember correctly, whatever we did in court was simply on the standing issue.

MR. PENA: Correct.

THE COURT: But if you're telling me now that there are other [bases] for the motion to suppress, I need to have a full evidentiary hearing … on that.

MR. PENA: Well, the [bases] for the motion to suppress was lack of probable cause and lack of exigent circumstances. And the [complaint] affidavit states the facts upon which the police relied. They claimed that the anonymous phone call provided probable cause for the entry of the [Napoleon house] and exigent circumstances. … [The hearing] was just basically on the standing issue. We didn't get into any of the probable cause … actually, there was no search warrant initially, Judge. And, in my motion [to suppress], I alleged that the police entered the premises at 2920 Napoleon Street Rear, based on the anonymous phone call telling that, that the person that made the anonymous phone call and seen somebody being dragged into this home and being tortured; and, based on that evidence, on that call, they went prepared to investigate and went into the home and discovered the body [of Mr. Vasquez].

(14 RR 8-11).

The State's counsel argued that a hearing would be moot because Appellant had not introduced any new evidence to support a suggestion that he had standing. (Id.) Agreeing, the Appellant stood on his offer of proof:

MR. PENA: … And, in fact, the Court heard evidence of that and found that the Defendant doesn't have standing. And so, this [offer of proof] is really just to preserve the issue for appeal, Your Honor. (14 RR 13).

The trial court ordered the affidavit admitted as an offer of proof on their motion to suppress. (1 CR 333; 14 RR 7). The State subsequently filed a business records affidavit and accompanying records from the Webb County Appraisal District, establishing that the Napoleon house was owned not by "Pantera," but by Ricardo Rocha and Zenaida Sanchez Rocha; this was true at all times in 2013, up until April of 2014.[8] (1 CR 310-314). The records were admitted at trial. (18 RR 40).

## ARGUMENT AND AUTHORITY

### A. The Procedural Posture and Scope of the Record

The Appellant's Brief asserts that, because he was the sole witness at the cursory standing-only hearing on September 11, 2014, "Appellant's testimony was not contradicted or impeached, and therefore he established that he had a subjective expectation of privacy in a place which society recognizes as reasonable, namely a home." (Ant. Brief at p. 28). So there is an initial question: whether the Appellant can slam the door shut as of September 11, 2014, and exclude the evidence as later developed at trial,

---

[8] The Rochas were foreclosed on in April of 2014, at which time a substitute trustee conveyed the property to Carlos Chapa. (1 CR 310-312).

where his testimony was thoroughly contradicted and impeached, from this Court's consideration.

The answer is no. A ruling on a motion to suppress is an interlocutory decision that may be reconsidered by the trial judge. *State v. Henry*, 25 S.W.3d 260, 262 (Tex. App.—San Antonio 2000, no pet.) The trial judge is not precluded from such reconsideration unless there is an interlocutory appeal or until the judgment becomes final. *See id*. Therefore, the trial court had plenary power to rehear the motion to suppress as a whole after having the preliminary hearing on standing. *See id.; State v. Wolfe*, 440 S.W.3d 643 (Tex. App.—Austin 2010). The trial court could also carry over the issue into the trial, all the way until the end; conversely, the Appellant was free to re-urge the motion at any time. *Garza v. State,* 126 S.W.3d 79, 81–82 (Tex. Crim. App. 2004). Appellant chose not to do so until he got here.

As such, the Court may properly consider everything taken into evidence after the September 11, 2014 hearing, in addition to the Appellant's testimony at the September 11 hearing and the officer's affidavit that Appellant himself put into evidence through his offer of proof.

## B. Standard of Review

In reviewing a trial court's ruling on a motion to suppress, "the trial court is the sole trier of fact and judge of the credibility of the witnesses and the weight to be given their testimony." *State v. Ross,* 32 S.W.3d 853, 855 (Tex. Crim. App. 2000). The appellate court should give "almost total deference to a trial court's determination of the historical facts that the record supports especially when the trial court's fact findings are based on an evaluation of credibility and demeanor." *Guzman v. State,* 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). A similar deference should be accorded the trial court's rulings on "application of law to fact questions," also known as "mixed questions of law and fact," if the resolution of those ultimate questions turns on an evaluation of credibility and demeanor. *Id* . Any "mixed questions of law and fact" which do not rely upon an assessment of credibility and demeanor should be reviewed *de novo. Id.*

Accordingly, the Court should give almost total deference to the trial court's resolution of historical facts and review the application of the law of search and seizure *de novo. See Carmouche v. State,* 10 S.W.3d 323, 327 (Tex. Crim. App. 2000). If a trial court does not file findings of fact, the Court should assume that the trial court made implicit findings that support the ruling, so long as those implicit findings are supported by the

record. *Corbin v. State,* 85 S.W.3d 272, 275-76 (Tex. Crim. App. 2002) (citing *Ross,* 32 S.W.3d at 855). Here, the trial court did not make findings of fact, and the Court should therefore review the evidence in the light most favorable to the trial court's ruling. *See Carmouche,* 10 S.W.3d at 327-28.

## C. Applicable Law

The purpose of the Fourth Amendment's limitation on government power "is to safeguard an individual's legitimate expectation of privacy from unreasonable governmental intrusions." *Villarreal v. State,* 935 S.W.2d 134, 138 (Tex. Crim. App. 1996). An accused has standing, under both constitutional provisions, to contest a search only if he had a legitimate expectation of privacy in the place searched. *Villarreal,* 935 S.W.2d at 138. The Appellant had the burden of proving facts establishing a legitimate expectation of privacy. *Calloway v. State,* 743 S.W.2d 645, 650 (Tex. Crim. App. 1988). The Appellant may carry his burden by proving that (a) by his conduct, he exhibited an actual subjective expectation of privacy, i.e., a genuine intention to preserve something as private; and (b) circumstances existed under which society was prepared to recognize his subjective expectation as objectively reasonable. *Granados v.*

*State,* 85 S.W.3d 217, 223 (Tex. Crim. App. 2002); *Villarreal,* 935 S.W.2d at 138.

The question here concerns factor (b), whether Appellant's expectation of privacy in the Napoleon Street dungeon is objectively reasonable. The following factors are relevant in determining whether a claim of privacy is objectively reasonable: (1) whether the accused had a property or possessory interest in the place searched; (2) whether he was legitimately in the place searched; (3) whether he had complete dominion and control and the right to exclude others; (4) whether, prior to the intrusion, he took normal precautions customarily taken by those seeking privacy; (5) whether he put the place to some private use; and (6) whether his claim of privacy is consistent with historical notions of privacy. *Villarreal,* 935 S.W.2d at 138. "This list of factors is not exhaustive, however, and none is dispositive of a particular assertion of privacy; rather, [the court will] examine the circumstances surrounding the search in their totality." *Granados*, 85 S.W.3d at 223.

## D. Application, Part 1: Appellant Failed to Establish Standing at the Suppression Hearing or Through His Offer of Proof

First, let us assume that the Appellant is actually able to close the door, and limit the evidence before the Court to only what was said at the September 11, 2014 hearing, plus the officer's complaint affidavit that Appellant included in his offer of proof. Even with Appellant's limits in place, the record is against him, for the following reasons.

### 1. Overnight Guest?

Appellant argues that he was an authorized overnight guest and had standing to suppress the evidence on that basis. *See Luna v. State*, 268 S.W.3d 594, 602 (Tex. Crim. App. 2008). Appellant claimed he got authority to stay overnight at the Napoleon Street house from Abel Rocha, Sr., a/k/a "Pantera"; Appellant further claimed that Pantera was the owner of the house, and that he let it to Appellant under a rental agreement so long as Appellant would sell drugs there. (13 RR 25-27). At the September 11, 2014 hearing, there was no evidence besides Appellant's testimony to establish that Pantera (Abel Rocha, Sr.) was an owner or lessor of the house, or that he had any authority to lease the house to Appellant on behalf of the actual owners, Ricardo Rocha and Zenaida Sanchez Rocha; on the contrary, Appellant acknowledged that Ricardo and Zenaida Rocha

never told him he could stay there. (13 RR 27). Moreover, Appellant gave contradictory testimony about where he lived overnight, admitting that he was arrested at a house on Bismark Street. (13 RR 25). So even assuming Appellant's testimony was golden, the undisputed portion establishes, at most, that Appellant was an invited guest of Abel Rocha, Sr., a/k/a "Pantera," who may or may not have been the landlord, and that Appellant may or may not have stayed at the Napoleon Street death shack overnight. (13 RR 25).

Appellant stipulates that the officer's complaint affidavit is part of the record from the original hearing by virtue of his offer of proof. (Ant. Brief at p. 28). Unfortunately for him, the affidavit states:

> "On Thursday August 29, 2013 at approximately 7:32pm … an unidentified caller [stated] … that a male subject was being tortured and dragged inside a small house with a wooden fence … **[Detective] Perez then proceeded to make contact with property owner [Zenaida] Sanchez who identified the correct location as 2920 Napoleon St. (Rear), and provided a written consent to search the property.**"

(1 CR 336).

This statement, which Appellant adamantly wants in the record, creates another factual dispute about who owned Blackacre, or rather, 2920 Napoleon St. Rear, at the time of the search; whether or not "Pantera" was really the owner raises yet another issue on whether "Pantera" had

authority to lease the premises or give permission to Appellant to stay there.

An individual who has no possessory or proprietary interest in the premises, but is a guest, has no clothes in the house, or other belongings, has no legitimate privacy interest in the premises searched. *Calloway,* 743 S.W.2d at 650. Additionally, an individual has no valid expectation of privacy in a home where he is simply a guest and does not control entrances or exits from the premises. *Black v. State,* 776 S.W.2d 700, 701 (Tex. App.—Dallas 1989, pet. ref'd); *Villarreal v. State*, 893 S.W.2d 559, 561 (Tex. App.—Houston [1st Dist.] 1994), *aff'd,* 935 S.W.2d 134 (Tex. Crim. App. 1996). Appellant gave inconsistent testimony as to where he actually lived; he also admitted that he did not have exclusive control over the doors, but supposedly shared that control with Pantera. (13 RR 28). And the evidence that Pantera even had such control to grant was as elusive as the Cheshire Cat.

## 2. Lessee?

Appellant might also be able to concoct standing if he can prove that he is an authorized lessee of the premises. *See Black v. State*, 776 S.W.2d 700, 701 (Tex. App.—Dallas 1989). But, in order to elevate Pantera's

questionable invitation into an actual lease which could impart standing, Appellant would have to prove the usual elements of a contractual lease, namely *consideration*. Appellant described such as follows:

> Q. How is it that [Pantera] gave you permission to stay there? In what way did he give you permission to stay there?
>
> A. Well, because I used to sell drugs there.

(13 RR 26).

So Pantera supposedly let Appellant stay at the Napoleon house because he was selling drugs for Pantera. Pardon the flashback to 1L Contracts class, but it goes without saying that "contracts against public policy are void and will not be carried into effect by courts of justice [and these] are principles of law too well established to require the support of authorities[;] and the only question is whether the agreement set forth in the petition be or not in violation of public policy or in fraud of the law." *Fairfield Ins. Co. v. Stephens Martin Paving, LP*, 246 S.W.3d 653, 671 (Tex. 2008) (quoting *James v. Fulcrod,* 5 Tex. 512, 520 (1851)). A contract for an illegal purpose—'hey man, I'll let you stay at the death shack if you sell drugs for me'—is void ab initio. *Crowell v. Housing Authority of City of Dallas*, 495 S.W.2d 887 (Tex. 1973). Accordingly, this 'lease' would not be recognized by society as conferring an objectively reasonable privacy interest. *Cf. Villarreal,* 935 S.W.2d at 138.

So in Appellant's world, where only his testimony and the officer's affidavit count as evidence on the motion to suppress, it is not at all clear that "Pantera" had any authority to grant a leasehold to Appellant, that such grant was valid, that it conferred an objectively reasonable privacy interest, or even that Appellant actually lived at the Napoleon Street shack. The trial court was well within its discretion to resolve these matters against Appellant, and those resolutions are respectfully taken with deference on appeal. *See Carmouche,* 10 S.W.3d at 327-28.

### 3. The Trial Evidence

Looking past the Appellant's world to the evidence admitted at trial, the State brought in records from the Webb County Appraisal District to establish that Pantera was not the owner at the time of the search. (18 RR 40). Appellant conceded that the then-owners, Ricardo Rocha and his wife, Zenaida Sanchez Rocha, never permitted him to stay at the Napoleon Street house of death. (18 RR 27). They did, however, authorize the police to search the house. (18 RR 17-19). That dispenses with the need for probable cause and a warrant exception. But since Appellant has briefed that issue, it will be answered next.

**E. Application, Part 2: Appellant's Probable Cause Argument Ignores the Rochas' Waiver and the Emergency Exception**

Assuming arguendo that Appellant somehow obtained standing from Pantera by selling drugs for him, Appellant makes the following substantive argument based on the same officer's affidavit that defeated his standing claim: "the police officers entered the home (where the body of the victim was found) without a warrant based on an anonymous telephone call in which a woman claimed that someone had been dragged into a house and was being tortured, and the police did not know whether the caller had personal knowledge of the facts upon which the police relied, or whether the caller was a credible person, the police lacked probable cause to justify a warrantless entry into the home." (Ant. Brief at p. 29). Accordingly, he says that all of the evidence obtained from that house should have been excluded. (Id. at pp. 29-30).

The gist of the argument was that the "anonymous telephone call" was not a sufficient basis for the development of probable cause, because "the police did not know whether the caller had personal knowledge of the facts upon which the police relied, or whether the caller was a credible person…." (Ant. Brief at p. 29). Appellant confuses anonymous *tips* with anonymous *distress calls*. These are two different animals, distinguished

by whether the crime involves danger to life. *Compare State v. Simmang*, 945 S.W.2d 219, 233 (Tex. App.—San Antonio 1997) (anonymous tip case affirming suppression where there was no danger) with *Laney v. State*, 117 S.W.3d 854, 862 (Tex. Crim. App. 2003) (distress call case affirming denial of suppression when there was danger to a child). Anonymous *tips* must be corroborated. *Simmang*, 945 S.W.2d at 233. *Distress calls* need no such corroboration per se; they are handled under a completely different set of rules, as described below.

The *Mincey* emergency-aid doctrine holds that "'[t]he need to protect or preserve life or avoid serious injury' [can justify] a warrantless intrusion and limited search of a private residence." *Laney*, 117 S.W.3d at 858 (quoting *Mincey v. Arizona*, 437 U.S. 385, 392 (1978)). The key issue is not corroboration of the anonymous call leading to the officer's response, but rather an objective test. "Under the emergency doctrine, the officer [must have] an immediate, reasonable belief that he or she must act to "protect or preserve life or avoid serious injury." *Laney*, 117 S.W.3d at 861. Since the caller reported that Mr. Vasquez was being kidnapped and tortured, the officer was justified in entering the house in order to protect Mr. Vasquez's life. *Laney*, 117 S.W.3d at 861. Although the officer was

too late, anything found in plain sight could be then and there seized. *Id.* That is exactly what happened.

Appellant also mentions the lack of a search warrant. Upon determining that there was no longer an emergency, the police obtained a consent to search from the owners of the property. (1 CR 336; 18 RR 18). This obviously removed any need for a warrant.

As such, the State respectfully requests that Appellant's third point of error, concerning standing to contest the search, be overruled.

# **PRAYER**

WHEREFORE, PREMISES CONSIDERED, the State prays that the conviction be AFFIRMED.

Respectfully submitted,

ISIDRO R. ALANIZ
DISTRICT ATTORNEY
49TH JUDICIAL DISTRICT

By:___/s/_____
David L. Reuthinger, Jr.
Assistant District Attorney
Webb County, 49th Judicial District
1110 Victoria St., Suite 401
Laredo, Texas 78040
(956) 523-4900 / (956) 523-5070 (Fax)
Bar No.  24053936
**ATTORNEY FOR APPELLEE**

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing brief complies with Rule 9.4, Texas Rules of Appellate Procedure, as amended, and that the word count, less exempt sections, is 9,635.

Date: July 8, 2015

___/s/_____
David L. Reuthinger, Jr.
Attorney for Appellee

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing Appellee's Brief has been delivered to J. Eduardo Pena, attorney for the Appellant, via eFileTexas e-Service to jpena84@att.net.

Date: July 8, 2015.

___/s/_____
David L. Reuthinger, Jr.
Attorney for Appellee